CAROLINA DIEZ RAMOS, represented by her guardian ad litem DR. FEDERICO DIEZ RIVAS, Plaintiff and Appellant, *v.* PEDRO JOSÉ DÍAZ DIEZ ET AL., Defendants and Appellees.

No. R-62-151.           Decided June 20, 1963.

*Vicente Géigel Polanco, Ángel M. Villamil,* and *Vicente Géigel Lanuza* for appellant. *Jorge Luis Córdova, Jorge L. Córdova, Jr.,* and *Carlos Cebollero* for appellees.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, pro tempore, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

PER CURIAM: By deed No. 77 of August 15, 1956, executed before Notary José Enrique González Quiñones, appellant Carolina Diez Ramos conveyed to her nephew, Pedro José Díaz Diez, the ownership of two properties which according to their record in the Registry were of a rural nature, but which according to their present location lie within the urban zone of the city of Caguas. The correlative promise of the assignee consisted in (a) discharging the assignor from the payment of a mortgage lien for $5,500 principal and the interest accrued up to the date of execution amounting to $990, as well as from other unsecured debts totalling $1,578.29; (b) assuming the payment of property taxes amounting to $845.46; (c) constituting a life usufruct in favor of appellant on a house and lot situated on Manuel Soto Aponte Street No. 22, of Caguas, the value of which was estimated at $65 a month; and (d) binding himself to pay to said assignor a life income of $100 a month, which payment was secured by a lien denominated annuity, constituted on a certain real property owned by Inocencia Diez Ramos, mother of the assignee and sister of the assignor.

In August 1960 Carolina Diez Ramos, represented by

her guardian ad litem, Dr. Federico Diez Rivas,[1] resorted to the Superior Court seeking the annulment of the deed in question and claiming damages. After stating that she was the owner of the two properties object of the contract and describing the manner in which she had acquired them, she alleged substantially that she is a person whose mental development is deficient, with an intelligence quotient of 40 to 50 and a 7-year-old mentality; that she has suffered frequent nervous depressions and has undergone medical, psychological and psychiatric treatment, and had been confined in the Psychiatric Center of the School of Medicine of Puerto Rico from March 18 to April 10, 1958, and in Clínica Dr. M. Juliá from November 1 to 17, 1958; that she lacks the judgment, capacity and understanding necessary to administer her property and to execute transactions thereon, and that in order to do so she needs the help, counselling and guidance of her family and friends; that defendants Pedro José Díaz Diez, his wife Olga Armstrong and his mother Inocencia Diez Ramos have insisted since 1946 that plaintiff assign to them the said real property for a minimum price; that defendants induced her to lease one of the properties to defendant Inocencia Diez Ramos for a term of five years, extendible for three additional years, for a monthly rental of $40, as it appears from the deed of December 13, 1946; that the said defendant assigned the lease right to her son, codefendant Pedro José Díaz Diez, who subsequently, by deed of May 5, 1954, induced plaintiff to assign the lease to him again, which she did, for a monthly rental of $46 for a five-year term, extendible for five additional years, which would expire on July 31, 1969; that plaintiff, induced by false and fraudulent simulations of defendant Pedro José Díaz Diez, signed a public deed on July 14, 1956 whereby she granted to Mariano

---

[1] Plaintiff was adjudged incapacitated by order of July 28, 1960, of the Superior Court, San Juan Part, three and one half years after the deed challenged was executed.

C. Molina and José E. González Quiñones, or to their assigns, an option to purchase said properties for the price of $25,000; that subsequently Molina and González assigned their rights under the option contract to defendant Pedro José Díaz for the price of $5,000; that early in August 1956, the defendants, acting in concert, kidnapped plaintiff, carrying her by force out of her home and away from her husband, Martín Caballero, and maintained her isolated, separated and hidden from her spouse for approximately two weeks, and in the course of her kidnapping, forcing her will, by violence, threats and false and fraudulent simulations, without the assistance and advice of her husband, and without her fully realizing their actions because of her deficient mental development, her condition of nervous depression and mental confusion to which she was subjected, they induced and compelled her to sign the deed sought to be annulled.

The basic allegation of the complaint is contained in the tenth paragraph thereof which reads thus:

"10. That the said purchase and sale, usufruct and annuity operation which is set forth in deed No. 77 of August 15, 1956, was a simulated, sham and deceitful act, without the concurrence in such transaction of the free consent of plaintiff Carolina Diez Ramos nor any cause valid in law, without there being equity in the transaction, since certain properties which at the time of execution of said deed had and have a market value of not less than $80,000 appear to have been sold for $40,000 and the $40,000 was not even paid, as a result of which defendants Pedro José Díaz Diez and his wife have unjustly enriched themselves at the expense of the presumptive vendor, plaintiff herein, who by reason of her deficient mental development, nervous depression and mental confusion caused by her kidnapping, could not realize that they were making a mockery of her rights and depriving her illegally of her property."

After the suit was transferred to the Caguas Part of the Superior Court and the complaint was answered, the hearing

was held at which the parties introduced oral and documentary evidence.

Judgment was rendered on May 4 dismissing the complaint. The trial court made the findings of fact which we copy below:

"1. Plaintiff was born in Caguas in 1902 and has lived in Caguas ever since. She is a woman with hardly any schooling, has lived in the community of Caguas without her mental capacity having been questioned by her neighbors, among them, different notaries before whom she executed deeds and officers before whom she contracted marriage on two occasions and divorced once, prior to 1957.

"2. Plaintiff was the owner of a certain property of over 16 cuerdas, with an old house divided into several dwellings. Since 1935 at least she has leased the property (with the exception of the house and lot) to her sister Inocencia and to the latter's son, defendant Pedro José Díaz Diez. The last lease to Pedro José Díaz Diez was executed in 1954 for a monthly rental of $46, for five years, with two consecutive options of five years each.

"3. Around the middle of 1956 Martín Caballero and plaintiff decided to sell the property. They asked the mayor to recommend some lawyer to handle the matter. The mayor recommended J. E. González Quiñones. They called upon him, informed him of their intention, and González contacted a broker, Mariano Molina, who asked for an option. Caballero and plaintiff preferred that González Quiñones also appear in the option, and eventually Caballero and his wife executed a deed of option to sell in favor of Molina and of González Quiñones for the price of $25,000, *which Caballero himself fixed.*

"4. After the deed of option was executed the owners of the option offered to sell the property to lessee Pedro José Díaz Diez for $30,000. The latter was annoyed upon learning of the option and fearing that Martín Caballero would squander the proceeds of the sale, which fear was not unfounded as suggested by the evidence, he went to see Judge José Villares Rodríguez, a relative of plaintiff by marriage, in order to find out whether it was possible to dissuade her from selling and to set aside the option.

"5. A meeting was held· in the office of Judge · Villares, but plaintiff insisted on going ahead with the deal and thereupon defendant said that he would purchase the property. There followed a disagreement between Caballero and plaintiff. Fearing that if she sold the property for cash Caballero would squander the proceeds of the sale, plaintiff told her nephew Pedro José about her fears and the latter referred her to González Quiñones, who consulted Judge Villares. As a result, Díaz Diez decided to purchase the option, instead of the property, from Molina and González Quiñones, and paid $5,000 for it. Subsequently deed No. 77 was executed on August 15, 1956 before Notary José E. González Quiñones, whereby plaintiff sold the property to Pedro José Díaz Diez for a price consisting of: (a) $8,913.77, value of a mortgage on the property, and other sums which plaintiff owed the vendor; (b) a life annuity of $100, secured by mortgage, which the vendee would pay to the vendor; (c) the life usufruct of a residence for plaintiff, which was rented for $65 a month before plaintiff acquired the usufruct therefrom. For the purposes of the deed of sale, the Notary appraised the life annuity and the life usufruct from the residence at $31,124.90, thereby obtaining a total selling price of $40,038.65. The Notary did not overestimate the value of the life annuity and of the life usufruct. The evidence shows that the value was not less than that, since at that time it would have cost plaintiff $36,817.11 to purchase in the market, from an insurance company, a life annuity of $165 a month.

"6. As a result of the disagreement between plaintiff and her husband, plaintiff, fearful of his reaction upon learning that the sale would not produce cash money, wanted to run away from her husband and to that end she sought the help of her nephew Pedro José and of her brother Rafael who took her, at her request, to the house of a friend of hers in Santurce. Subsequently, about two months after running away to Santurce, she returned to Caguas to live with another friend and she was finally reconciled with her husband.

"7. In 1957 and 1958, another nephew of plaintiff, Federico Diez Rivas, took an interest in annulling the sale which plaintiff made to Pedro José Díaz Diez and took her to San Juan to see different psychiatrists and psychologists. On a certain occasion, in 1958, plaintiff herself wanted to undergo treatment and of

her own volition she was confined in Clínica Juliá for a short time.

"8. On July 8, 1959 plaintiff filed a complaint seeking to annul the sale made to Pedro José Díaz Diez. Plaintiff herself swore the complaint. Afterwards, on August 4, 1960, plaintiff desisted from that complaint after another identical one was filed in her name by Federico Diez Rivas, appointed 'guardian ad litem' by the Superior Court, San Juan Part, in an ex parte proceeding in which the Superior Court, San Juan Part (it is significant that resort was not had to the Caguas Part where the action should have been filed, the jurisdiction where plaintiff and her husband were well known), determined on July 28, 1960 that plaintiff was at that time 'incapacitated to administer her property.'

"9. The opinions of the different witnesses as to the market value of the property at the time of the option and sale ranged from a minimum of $25,000 or $30,000 to a maximum of $63,750. Taking into consideration (1) the willingness of Caballero to sell for $25,000, (2) the willingness of the co-owners to sell the option, among whom were persons familiar with values of real property in Caguas, which they actually did, on the basis of a value of $30,000, and (3) the expert evidence, our opinion is that the property did not have a market value of over $30,000.

"10. The complaint assumes fundamentally that defendant Pedro José Díaz Diez resorted to improper means to induce plaintiff to grant an option to sell so that he could purchase the property. *The entire evidence establishes definitively that defendant had nothing to do with the granting of the option, nor with plaintiff's decision to sell the property. Plaintiff herself and her husband Martín Caballero were the ones who decided to sell, who decided to grant the option, and who fixed the price of $25,000 for the property which can not be deemed inadequate.*

"11. As to plaintiff's incapacity, there is no evidence at all to show that she was incapacitated to administer her property in 1956. The order of the Superior Court, San Juan Part, determines that she was not capacitated in 1960. The expert evidence, consisting of written reports of psychologists Dieppa and Sifre and letters of psychiatrists Tejedor, Roselló and Homedes, shows (1) that in 1958 the case was diagnosed as one of schizophrenia of a paranoid type; (2) that Dr. Sifre examined her in April 1957 and concluded that her intellectual level was border-

line, that is, it was in the margin between normal and deficient; (3) Dr. Dieppa examined her in May 1957 and found that she was mentally deficient. Afterwards Dr. Dieppa rectified and agreed that the discrepancy in the findings of the examinations made by the two psychologists was due to the fact that 'Dr. Sifre was able to obtain information, for examination purposes, from Mrs. Diez Ramos,' while at the time Dr. Dieppa examined her she was *very scared,* and 'there is no question that such emotional state contributed greatly to her inability to answer correctly the questions which I made to her.' It must be added at this point that although Dr. Dieppa assumes that plaintiff was calm when Dr. Sifre examined her, this was not so, according to Dr. Sifre himself, who says that 'she was nervous and the examination itself helped to produce certain tension which did not dissipate completely.'

"12. There is no question that from the time plaintiff and Caballero decided to sell the property, and owing to the disagreements over such decision and subsequently, owing to the efforts made during the examinations to which plaintiff was submitted in order to determine her mental capacity, plaintiff has suffered emotional depressions since 1956 which, according to the opinions of the experts appearing of record, must have affected her mentally. Notwithstanding this and the distress unquestionably caused her by the trial in this case, and especially her testimony as a witness, her testimony was normal and competent, entirely consistent with the history of mental capacity known in her own community. At the most, the evidence casts doubt on her lack of mental capacity to administer her property in 1957 and in 1958. Indeed, it fails to establish plaintiff's incapacity in July and August 1956.

"13. The intervention of Judge Villares Rodríguez has been violently and unjustifiedly challenged by plaintiff. The evidence shows that Judge Villares Rodríguez intervened as a relative of plaintiff and that his intervention did not have any purpose or result other than to protect plaintiff's interests. These interests were threatened by the nature of the transaction which plaintiff and her husband, Martín Caballero, proposed to carry out, namely, the sale of the property for $25,000 in cash. When plaintiff realized the danger which the conversion of all her property into cash money represented to her, the advices of her

relative, Judge Villares Rodríguez, helped her to find an alternative which was more beneficial to her." (Italics ours.)

The petition for review assigns seven errors which are basically aimed at challenging the weighing of the evidence.[2]

---

[2] The errors assigned are the following:

"1. The findings on the essential facts of the case which serve as a basis to the judgment are not substantiated, justified nor supported by the evidence admitted at the trial, and such findings of fact are unequivocally erroneous, whimsical and arbitrary.

"2. It failed to take into consideration the order of the Superior Court, San Juan Part, declaring that plaintiff Carolina Diez Ramos 'has a deficient mental development, having been able to pursue studies up to the fourth grade only of elementary school and having an intelligence quotient of approximately 40 to 50; that she has suffered and is suffering from psychosis, and has not had nor has at present judgment, capacity and understanding to administer her property.' Nor did it take into consideration the psychiatric testimony of Dr. Juan Roselló and Dr. Fernando Texidor Pascual which served as a basis to the order of incapacity issued by the court. The said court did not take into consideration that the fact of her incapacity, lack of judgment and understanding of plaintiff to administer her property vitiate the consent given by her in deed No. 77 of August 15, 1956, which is challenged in this appeal.

"3. It failed to take into consideration plaintiff's kidnapping at the time of signing the deed in question by defendant Pedro Díaz Diez, who against her will removed her from her residence in Caguas, where she lived in the company of her husband Martín Caballero, to the house of a friend of hers in Santurce, urging and compelling her during the kidnapping to sign the deed, under violence, intimidation and deceit, thereby voiding the consent, according to the provisions of the Civil Code of Puerto Rico (31 L.P.R.A. § 3404).

"4. It failed to take into consideration that in the contracts of purchase and sale, usufruct and annuity contained in the said deed there was no meeting of the minds of the parties, nor understanding of the nature of the obligations, stipulations and conditions as respects plaintiff Carolina Diez Ramos by reason of her deficient mental development.

"Fifth Error. It failed to take into consideration that the said purchase and sale, usufruct and annuity operation contained in the said deed No. 77 of August 15, 1956, was a simulated, sham and deceitful act, without the concurrence in such transaction of the free consent of plaintiff Carolina Diez Ramos, nor any cause valid in law, nor equity, since certain properties which at the time of execution of said deed had a market value of not less than $65,000 to $80,000 appear to have been sold for $40,038.65, and that the said sum of $40,038.65 was not even paid, as a result of which defendants Pedro José Díaz and his wife have unjustly enriched themselves at the expense of the presumptive vendor, plaintiff

We have examined closely the transcript of the evidence as well as the documentary evidence introduced. Each and every one of the findings of fact of the trial court are supported by the evidence heard at the trial. This would be sufficient by itself to quash the writ issued. However, we wish to point out that the basic allegations of the complaint were devoid of any evidence, especially the allegation that defendant Pedro José Díaz induced plaintiff to grant an option to sell in favor of Molina and González. Far from establishing such fact, the evidence reveals uncontrovertedly that defendant learned of such transaction after the same had been carried out. It is most significant that the deed of option was signed jointly by plaintiff and her husband after executing a private instrument of the same tenor, according to which the price of the property is $25,000, of which plaintiff would have received the sum of $17,754.54 only after deducting the amount of the mortgage lien and interest thereon as well as the property taxes which were owing. Instead of this sum, which was the greater which plaintiff would have received under the option contract which she executed together with her husband, in the transaction subsequently carried out by the deed challenged and sought to be annulled, she received the right of life usufruct guaranteeing a dwelling for life and an income of $100 a month which also guarantees her subsistence. The explanation for changing the promise in favor of the assignor clearly appears from the transcript: to prevent plaintiff from receiving a cash sum which could be easily squandered, if not by her, by her hus-

---

herein, who by reason of her deficient mental development, nervous depression and mental confusion caused by her kidnapping, could not realize that they were making a mockery of her rights and depriving her illegally of her property.

"Sixth and Seventh Errors. We also submit these two errors on the arguments stated in our former memorandum, especially on the testimonies appearing in the stenographic record, which show clearly that the trial court did not decide this case with the correct impartiality proper of a sound administration of justice."

band, thereby forsaking her completely in her old age. Hence, Judge Villares' intervention who, as a relative and friend of the parties, helped to execute the transaction in the manner most favorable to plaintiff's interests. The adjectives used in appellant's brief to describe the magistrate's action are unjustified.

Regarding the allegation on the mental incapacity of plaintiff, it is necessary to clarify that the evidence admitted on this point is very weak. In the petition before this Court plaintiff urges us to consider the testimonies which the Superior Court, San Juan Part, had under consideration in the petition adjudging the mental incapacity and appointing a guardian ad litem. According to the order of May 1, 1962, the evidence offered in the petition of incapacity was admitted solely for the purposes of "pointing out the evidence which the San Juan Part had under consideration in the petition *supra* and not for the purpose of establishing that such evidence was true." This necessarily had to be so, since appellees were not a party nor were they summoned in the petition of incapacity. If this evidence is excluded, there are only in the present case certain certificates issued by Drs. F. Tejedor Pascual, Juan Homedes, Juan A. Roselló, Jorge A. Dieppa and Pedro A. Sifre Franco. We have examined them and, considering them in the light most favorable to appellant, it appears that she was suffering from an intellectual deficiency on the dates when she was examined by those physicians, all of which dates were subsequent to the signing of the deed. It is correct that in the report of Dr. Jorge A. Dieppa of May 11, 1957, it was set forth that the history suggests that "this condition (acute intellectual defect) has persisted for a long time, possibly since she was born." However, this conclusion, without more, considering as a whole all the circumstances surrounding the execution of the deed, is no ground for annulling the same.

Another aspect of the case on which greater emphasis is placed refers to the valuation of the real property object of the contract. In this connection, the evidence is conflicting. The allegation of the complaint is to the effect that the value of the property was not less than $80,000; plaintiff's evidence established a value of only $63,750; defendants' expert fixed it at $28,094; the trial court said in this respect that its market value did not exceed $30,000. This determination is supported by the evidence, especially if we consider that plaintiff herself, assisted by her husband, granted an option for $25,000. Furthermore, we must take notice of the factor of depreciation in value which constituted the lease contract the term of which expired in 1969 and which, for the reason that it was recorded in the Registry of Property, had to be respected by any third acquirer.

Nor do we understand that a witness' statement to the effect that the contract involved was complicated has a greater scope than if the contract were unusual and uncommon. In fact, the terms thereof, devoid of juridical designations, are relatively simple. The point is simply that plaintiff was discharged from the payment of certain debts the existence of which is not in question, and that she also received certain rights of usufruct and life annuity.[3]

Lastly, we cannot agree that appellant was "kidnapped" and hidden outside of Caguas as part of the scheme to obtain the transfer of the real property. The evidence fails to establish such fact. On the contrary, it was satisfactorily established that her separation from her husband was due to disagreements to the point that she planned on obtaining a

---

[3] Up to June 5 appellant had received rents in the sum of $8,200 and had enjoyed certain real property at the rate of $65 a month which netted $6,150, or a total of $14,350. The lease of one of the real properties under the terms of the existing contract would have produced $3,772 only. The evidence establishes that although the other real property was leased at the rate of $70 a month, as a general rule the tenants did not pay the rent.

divorce. To that effect, she entrusted the matter to Mr. González, an attorney, and urged him in writing to handle the same. As soon as she signified her desire to return to Caguas, her wish was granted.

In view of the foregoing, the writ issued will be quashed and the judgment rendered by the Superior Court, Caguas Part, will be affirmed.